WATKINS et al. v. ILLINOIS CENT. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. May 2, 1916.)

No. 2765.

RAILROADS ⟶129(1)—SALES—CONTRACTS—CONSTRUCTION—"ACCRUED LIA-
BILITIES."

    The vendors of a railroad were by the terms of the contract of sale to give possession on a certain date, and were to receive the income up to such date and to pay all "accrued liabilities." The tariff schedule then in force provided that on presentation of satisfactory evidence to the freight claim agent that manufactured products had been shipped from any point over the road the charges on the material therefor shipped in should be reduced to a lower rate given in the schedule. After the transfer, satisfactory evidence was produced to the freight claim agent that lumber shipped out was made from logs which the road had carried in before the transfer and on which the higher rate had been paid, and the difference between the two rates was refunded. *Held*, that such rebate was an "accrued liability" at the time of the transfer, within the meaning of the contract, and that the vendors, who received the higher rate, subject to the contingency of making the refund, were liable therefor.

    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 392, 399; Dec. Dig. ⟶129(1).

    For other definitions, see Words and Phrases, First and Second Series, Accrue.]

Appeal from the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Suit in equity by the Illinois Central Railroad Company and others against John H. Watkins and others. Decree for complainants, and defendants appeal. Affirmed.

Caruthers Ewing, of Memphis, Tenn., for appellants.

C. N. Burch, of Memphis, Tenn., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. This appeal involves only the true meaning of the phrase "accrued liabilities," as used in a contract. Watkins and his associates owned the entire capital stock of a short railroad, which may be distinguished as the Tennessee Railroad. They sold this capital stock to the Illinois Central Railroad Company, and a carefully written contract, between vendors and purchaser, was made. It was clearly the general purpose to have the contract take effect as of January 1, 1913, and it accordingly provided that the vendors should indemnify and keep harmless the

purchaser and the Tennessee Railroad from all liability "for or on account of any claims or liabilities of whatever kind or nature incurred by the Tennessee Company before the 1st day of January, 1913, and that all current income of the said Tennessee corporation accruing before the date last aforesaid shall be appropriated by or belong or be payable to the vendors, to the intent that all income and all accrued liabilities * * * shall be borne by and belong to the vendors, * * * while all income and liabilities accruing * * * after the said date * * * shall be borne by and belong to the purchaser or the Tennessee corporation." Another clause provided that the vendors will "defend any suits which may arise against the said Tennessee corporation on account of transactions before [January 1, 1913], and pay any judgments rendered therein."

The Tennessee Railroad, before and after January 1, 1913, was engaged in shipping logs to Hickman, Ky., and in shipping out of Hickman, for the same shipper, manufactured products made from logs. A tariff, duly filed and in force, provided that: ·  .

"Upon presentation of satisfactory evidence to the freight claim agent of the [Tennessee Railroad] that the manufactured products have been shipped from all points via [the Tennessee Railroad], the charges on all material into such points will be reduced to the basis of rates specified on page 3."

The concrete meaning of this provision was that if the shipper paid (e. g.) 3 cents per 100 pounds upon his logs shipped into Hickman, and thereafter presented "satisfactory evidence" that he had shipped out the manufactured products over the same road, he was entitled to a refund of 1½ cents per 100 pounds against the sum he had paid on the inbound shipment. During the two or three months following January 1st, this shipper presented to the Tennessee Railroad "satisfactory evidence" of such shipment of manufactured products, and thereupon vouchers were allowed in his favor for refunds against the freight he had paid on inbound logs before January 1st. The controversy between the parties was at to which one, vendors or purchasers, must bear this burden.                                    .

The vendors insist that the liability cannot properly be called "accrued," so long as it remains contingent, and that since, on January 1st, the duty of the Tennessee Railroad to make refund was contingent upon the action of the shipper in thereafter manufacturing the logs into a different form and shipping the product out over this railroad, it is a perversion of the contract to charge this liability upon the vendors. We cannot think the word "accrued" or the phrase "accrued liability" has any such fixed and established, hard and fast meaning that the question is settled as soon as the statement is made. Some of the dictionary definitions of "accrued" are ample to cover such a liability as this; the parties did not say "matured," or "fixed and definite," or use other unambiguous language. They selected a word which may be applied in more than one way to the circumstances that later arose; but they are presumed to have intended its use in a particular sense, and that intent is to be determined from all parts of the contract and from the situation existing when it was made. The Supreme Court of Wisconsin, in construing

a statute, and after repeating that all its parts must be considered together, said:

"The verb 'to accrue' is often and properly used to convey the same idea as * * * 'to arise.'" Emerson v. Shawano, 10 Wis. 433, 435.

Most of the cases cited in the attempt to put a fixed meaning upon "accrued liability" are cases arising under statutes of limitation, where the question is when a right or a right of action accrued. Of course, there is no complete right of action until there has been a default, and so definitions of the words in this environment are not of much help here.

Considering all parts of the contract and the existing course of business, we think the natural inference is that this liability was to be charged against the operations of 1912. The vendors were reserving for themselves the 1912 income; that is, they were appropriating this very 3 cents per 100 pounds which it later developed could not be collected to the extent of 1½ cents if it was unpaid, or to that extent must be refunded if it had been paid. This refund was not charged upon or in reduction of the outbound freight rate accruing in 1913. It was, in effect, a correction of the erroneous inbound charge made in 1912. The substance of the tariff was that the inbound rate was 1½ cents in one contingency and 3 cents in another contingency, but that the higher rate must be paid and the excess temporarily held until the contingency was determined. Adopting the parties' broad idea of drawing the line of January 1st between what the vendors transferred and what they kept, we think this item belonged on the 1912 side of the line, and that the language does not clearly show their intent to put it on the other side. This conclusion is confirmed by the covenant of the vendors to be responsible for all liabilities "incurred" before January 1st, and to defend suits which might arise against the Tennessee Railroad "on account of the transactions before the date aforesaid." If the Tennessee Railroad refused to pay these refunds and the shipper brought suit, it would, indeed, be difficult to say that the suit did not arise on account of transactions before January 1st, or that the liability had not been incurred before that date.

Another consideration leading to the same conclusion is that according to the course of business from month to month the refunds which might later become owing on account of these inbound shipments, were entered upon the books of the Tennessee Railroad under an account entitled "Freight Claims—Suspense" and charged against "Freight Earnings." This seems to be a declaration that the liability was expected to develop into something which must be paid, and it apparently implies (although the bookkeeping is not fully disclosed) that the amount of the suspense claims was cut out of the 1912 net operating revenue shown by the books. Certainly it indicates a recognition by the parties that these refund claims constituted a liability which might arise on account of the transactions before January 1st.

The vendors further insist that the identity between the logs shipped in and the later outbound product did not sufficiently ap-

pear to make these claims lawful, under the tariff, against the Tennessee Railroad, and hence that the court could not recognize them as a liability within the contract. Decisions are cited of the courts and of the Interstate Commerce Commission which require a strict standard of identity in applying a transit rate; but this is not at all a transit tariff, or one covering "milling in transit." It does not provide, in any event, for a through rate from point of origin to point of destination. It is solely a regulation affecting the amount of the inbound rate. It was accorded to all shippers alike, the tariff was duly filed, and neither its fairness nor validity seems open to question. Just exactly what measure of identity between inbound and outbound materials it contemplated might give rise to dispute; but the tariff forecloses such dispute by providing that the refund will be allowed upon evidence satisfactory to the freight claim agent. It is not suggested that the agent acted unfairly or arbitrarily for the purpose of taking any advantage, or that he acted otherwise than in accordance with his best judgment and the established long-standing practice of all parties, in which practice the vendors had acquiesced.

We think the vendors are wrong in their contentions stated, and the decree below must be affirmed.